

FILED
MAR 30 2018
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

LESTER R. BELMAR, JR.,

     Petitioner,

v.                          Civil Action No. 3:16CV455

HAROLD W. CLARKE,

     Respondent.

### MEMORANDUM OPINION

Lester R. Belmar, a Virginia state prisoner proceeding with counsel, brings this petition pursuant to 28 U.S.C. § 2254 ("§ 2254 Petition," ECF No. 1). Following a bench trial in the Circuit Court for the City of Virginia Beach ("Circuit Court"), Belmar was convicted of second-degree murder, malicious wounding, and two firearm charges. (Id. ¶ 3.) The Circuit Court sentenced Belmar to a term of fifteen years of imprisonment. (Id.)

In his § 2254 Petition, Belmar, alleging ineffective assistance of counsel, asserts relief on the following ground:

> A plea offer was made to the Petitioner's trial attorney, Mr. Bullock[,] by the Commonwealth's Attorney, and the offer was never communicated to the Petitioner. The plea offer was extremely favorable, and if it had been communicated to the Petitioner and adequately discussed, the Petitioner would have accepted the plea offer.

(Id. ¶ 32.)   For the reasons set forth below, the Court finds that Belmar has satisfied his burden and has shown that his counsel was ineffective; and that Belmar would have accepted the proffered plea.   Accordingly, Belmar's § 2254 Petition with respect to the above claim will be granted.

The Court has issued two previous opinions respecting this Petition.   This Memorandum Opinion will not recount the procedural issues covered extensively in those opinions. Nevertheless, before addressing the merits of Belmar's claim, it is necessary to resolve the issue of procedural default.

## I.   Belmar's Default Of His Claim Is Excused Because The Requirements Of Martinez v. Ryan Are Satisfied

By Memorandum Order entered on October 24, 2017, the Court held that Belmar had pled a new claim of ineffective assistance of counsel that had been procedurally defaulted.   (ECF No. 14, at 7-8.)   As previously explained:

> In Coleman v. Thompson, 501 U.S. 722 (1991), the Supreme Court "held that attorney error committed in the course of state postconviction proceedings—for which the Constitution does not guarantee the right to counsel—cannot supply cause to excuse a procedural default that occurs in those proceedings." Davila v. Davis, 137 S. Ct. 2058, 2065 (2017) (internal citation omitted) (citing Coleman, 501 U.S. at 755). In Martinez v. Ryan, 566 U.S. 1 (2012), the Supreme Court announced an "'equitable . . . qualification' of the rule in Coleman that applies where state law requires prisoners to raise claims of

ineffective assistance of trial counsel 'in
an initial-review collateral proceeding,'
rather than on direct appeal." Davila, 137
S. Ct. at 2065 (quoting Martinez, 566 U.S.
at 16, 17). Specifically, the Court held
that in such situations, "'a procedural
default will not bar a federal habeas court
from hearing a substantial claim of
ineffective assistance at trial if' the
default results from the ineffective
assistance of the prisoner's counsel in the
collateral proceeding." Id. (quoting
Martinez, 566 U.S. at 17).

(Id. at 8-9.)

Further, the Court also found that:

Belmar has made a sufficient preliminary
showing that state habeas counsel performed
deficiently by failing to plead in a proper
manner Belmar's ineffective assistance of
trial counsel claim. Furthermore, for much
the same reasons discussed above with
respect [to] the first Martinez element,
Belmar has made a sufficient preliminary
showing that he was prejudiced by habeas
counsel's actions. See Juniper, 117 F.
Supp. 3d at 790. At this juncture, material
facts remain in dispute regarding the
performance of trial counsel and whether
Belmar can demonstrate prejudice from any
omissions of trial or habeas counsel. Id.
(observing that "the Martinez exception to
the procedural-default bar includes within
it consideration of the merits of the
procedurally defaulted claim"). Under such
circumstances, Belmar "should be afforded an
evidentiary hearing to develop a proper
factual record." Hill v. Glebe, 654 F.
App'x 294, 295 (9th Cir. 2016) (citing
Detrich v. Ryan, 740 F.3d 1237, 1246-48 (9th
Cir. 2013)).

(Id. at 14-15) (emphasis added).

3

On March 19, 2018, the Court conducted an evidentiary hearing on Belmar's ineffective assistance of counsel claim. At the hearing, the record demonstrated, and Respondent conceded, that state habeas counsel performed deficiently by failing adequately to plead Belmar's claim of ineffective assistance of trial counsel. Furthermore, for the reasons discussed more fully below in Section III.C, Belmar has demonstrated, by clear and convincing evidence, that he was prejudiced by the omission. Accordingly, it is appropriate to address the merits of Belmar's claim.

## II. Summary Of The Events Surrounding The Charges

On May 21, 2011, Belmar operated a private security business in Virginia Beach. At that time, Belmar was roughly 28 years old and had been discharged from the Navy for a disability after 8 and ½ years of service. On the evening of May 21, 2011, Belmar's business was providing security for Hangar 9, a nightclub in Virginia Beach ("the Club"). There were approximately 14 of Belmar's employees on security duty at the Club that evening.

That night, there were between 200 and 300 young people at the Club. At some point, a number of skirmishes occurred between the patrons. Because of the number of altercations, it was agreed at around 1:00 a.m. that the Club should be closed

for the night.

Shortly thereafter, one of Belmar's employees informed Belmar that he had heard some patrons state that "there was going to be firing -- pull out guns and shoot at this MF-er and all this." (Oct. 4, 2012 Tr. 135.) At that point, Belmar went to his car to secure his duty belt with his gun.

As he was putting on his duty belt, Belmar got a call over his radio advising that an altercation was about to take place. Belmar then ran to the area of the parking lot where 15 to 20 young men were yelling at each other. Belmar told them that the police were on the way and that, if they did not leave, he would be forced to deploy pepper spray. At that point, the majority of the young men left the Club's parking lot.

There was a 7-Eleven store across the street from the Club. When a disturbance causes the Club to close, people from the Club often end up at the 7-Eleven store. The police had instructed Belmar and the Club's security personnel that, if there is an altercation at the Club, "to at least . . . let the [7-Eleven] cashier know because it's a lady and she works by herself at nighttime . . . ." (Oct. 2, 2012 Tr. 104; Oct. 4, 2012 Tr. 141.)

After breaking up the altercations in the Club's parking lot, Belmar and some of his security personnel, as instructed, went to the 7-Eleven store to advise the clerk of the situation.

After being warned by the Club's personnel of possible impending trouble, the cashier locked the doors and called the police. Soon, there were twenty to thirty cars and 60 to 80 people at the 7-Eleven store. One witness estimated there were 120 to 150 people there.

In any event, by the time that Belmar arrived at the 7-Eleven store, the scene was chaotic and a number of fights had broken out. According to Larry Johnson, a member of the Club's security staff, about fifteen men were fist fighting, one man had been knocked out completely, and other men were attempting to stomp him as he lay unconscious.

Meanwhile, the cashier was attempting to let customers out of the locked 7-Eleven store, and a number of men were trying to force their way into the store, notwithstanding that they had been informed that the store was closed. Belmar backed up the cashier and informed the people attempting to get into the store that they needed to leave. Thereafter, Belmar deployed pepper spray to diffuse another altercation that was occurring in front of the store.

After deploying the pepper spray, Belmar heard yelling behind him in the parking lot. Belmar observed Bolton, one of Belmar's employees, near the gas pumps, holding a man who was wearing a red jacket. Belmar observed another man laid out on the ground next to Bolton. In an effort to defuse the volatile

situation, Belmar joined Bolton by the pumps and persuaded the men who had assaulted the man on the ground to leave.

Shortly thereafter, a black Impala, occupied by three different men (including Darrell Spencer and Travis Baker), pulled up near Belmar. One of the occupants of the Impala informed Belmar that the man who had been knocked out and who was lying on the ground was his cousin, and he asked Belmar for permission to help his fallen cousin. Belmar agreed to let them load the fallen man into their car and leave. The men in the car were upset and wanted to know who had hurt the cousin. Belmar advised the men in Impala that the responsible individuals had left.

Belmar then turned to walk toward the door of the 7-Eleven store. While en route, Belmar heard six to eight rapid shots fired from the direction of nearby Lynnhaven Parkway. Some of the shots ricocheted off of the gas pump canopy above Belmar's head. So, Belmar turned around and drew his firearm. Belmar held his firearm at a forty-five degree angle toward the ground as he attempted to determine the source of the shots and what had precipitated the firing of the weapon.

Almost immediately, Belmar observed a man, later identified as Darrell Spencer, getting out of the back seat of the black Impala which was then about fifty feet away from Belmar. Spencer had what appeared to be a rifle in his hands. In fact,

Spencer's weapon was a shotgun. Belmar observed Spencer leaning over the top of the car (with his back toward Belmar) and pointing the shotgun in the direction of several of Belmar's employees. Belmar then aimed his gun at Spencer and yelled, "Hands, hands. Show me your hands." (Oct. 4, 2012 Tr. 165.) When Spencer did not obey, Belmar fired two shots at Spencer.

Although Belmar did not see Spencer fire his weapon, it is undisputed that, in fact, Spencer previously had fired the shotgun at a nearby car, striking the car and its driver. Belmar testified that two to three seconds passed between the time he heard those shots fired and when he shot Spencer.

Belmar aimed at the center of Spencer's back. Just before Belmar fired, Spencer "had one foot out [of] the vehicle, one foot on the floorboard, and he was standing with the rifle [the shotgun] straight up." (Oct. 4, 2012 Tr. 166.)

One of Belmar's shots struck Spencer in the head.[1] The gunshot wound had an "entrance at the right lower occipital scalp and an exit at the left frontal scalp." (Oct. 2, 2012 Tr. 42.) Spencer was killed instantly. Spencer's body fell halfway in the car and was slumped over the back of the front passenger seat. After having been shot by Belmar, Spencer had dropped the shotgun on the floorboard of the back seat on the driver's side

---

[1] The other shot struck the Impala.

of the Impala. Aware that there was a passenger in the back seat of the Impala, Bolton retrieved the shotgun from the Impala.

Travis Baker was seated in the driver's seat of the Impala. Baker was shot in the right rear shoulder. According to the prosecution's theory of the case, after the bullet exited Spencer's head, it continued on to strike Baker in the right rear shoulder. The Circuit Court apparently concluded that the most plausible explanation for Spencer's and Baker's wounds was: that Spencer was bending over to get back into the Impala with the shotgun when Belmar shot Spencer in the base of the skull; and that the bullet then exited near the top of Spencer's head and continued downward to strike Baker, who was seated in the driver's seat.[2]

In light of these circumstances, the Circuit Court found Belmar guilty of second-degree murder, malicious wounding, and two counts of using a firearm in the commission of a felony and sentenced him to an active term of imprisonment of fifteen years.

_____

[2] That might be so, but, at the evidentiary hearing held in this Court on March 19, 2018, the Commonwealth took the view that Spencer's head was in alignment with Baker's shoulder. If that is so, and considering the trajectory of the bullet from entry point to exit point, the shot would have been fired from above Spencer. There was nothing in the record to show the source of the bullet that hit Baker because the bullet, whatever its source, could not be removed from Baker, and therefore was not the subject of forensic analysis.

## III. Analysis

To demonstrate ineffective assistance of counsel, a convicted defendant must show first, that counsel's representation was deficient and second, that the deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). To satisfy the deficient performance prong of Strickland, the convicted defendant must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" Burch v. Corcoran, 273 F.3d 577, 588 (4th Cir. 2001) (quoting Strickland, 466 U.S. at 689). The prejudice component requires a convicted defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

"During plea negotiations defendants are 'entitled to the effective assistance of competent counsel.'" Lafler v. Cooper, 566 U.S. 156, 162 (2012) (quoting McMann v. Richardson, 397 U.S. 759, 771 (1970)). Generally, claims of ineffective assistance of counsel during the plea process fall into three categories. First, "the [complete] failure of a defense attorney to timely inform his client of a plea offer constitutes unreasonable

professional assistance." <u>United States v. Brannon</u>, 48 F. App'x 51, 53 (4th Cir. 2002) (citing <u>United States v. Blaylock</u>, 20 F.3d 1458, 1465-66 (9th Cir. 1994)). Second, a defense attorney's inaccurate advice or misinformation in conveying a plea offer may constitute deficient assistance. <u>Id.</u> (citing <u>Paters v. United States</u>, 159 F.3d 1043, 1047-48 (7th Cir. 1998). Third, incomplete advice in conveying a plea also may provide a basis for a claim of ineffective assistance of counsel. <u>See Wolford v. United States</u>, 722 F. Supp. 2d 664, 689 (E.D. Va. 2010).

Here, Belmar contends that he is entitled to relief because, his trial counsel, Martin Bullock, failed to convey a favorable plea offer made by the prosecution before the trial. In rejecting Belmar's ineffective assistance of counsel claim in the state habeas proceedings, the Circuit Court relied extensively upon an affidavit provided by Bullock to conclude that Bullock had conveyed the plea offer to Belmar who rejected it. The record before this Court establishes that the affidavit is untrue in a number of critical particular aspects and unreliable as a whole. The bases for that conclusion are outlined below as are the consequences that necessarily follow.

A. **The Plea Offer**

The record shows that, before trial, the Commonwealth offered to drop the murder, malicious wounding, and the use of

firearm charges and permit Belmar to plead guilty only to involuntary manslaughter and unlawful wounding. Petition for Writ of Habeas Corpus Ex. A, <u>Belmar v. Pearson</u>, No. CL14-4270 (Va. Cir. Ct. filed Sept. 13, 2014). "Under this plea offer, Belmar would have faced a maximum prison sentence of fifteen years' imprisonment." <u>Belmar v. Pearson</u>, No. CL14-4270, at 3 (Va. Cir. Ct. filed Sept. 13, 2014). Virginia's advisory sentencing guidelines for the plea offer of involuntary manslaughter and unlawful wounding provided for a sentencing range of 1 year and 11 months to 4 years and 11 months, with a mid-point of 3 years and 4 months. (ECF No. 11, at 10.) The statutory maximum punishment, under the plea offer, would have been fifteen years imprisonment. Without the plea agreement, Belmar faced a maximum sentence of sixty-eight years' imprisonment and a mandatory minimum sentence of eight years' imprisonment. <u>Belmar</u>, No. CL14-4270, at 3.

The plea offer was made verbally to Bullock and confirmed in a letter dated June 1, 2012, from Harvey L. Bryant, the Commonwealth's Attorney which stated:

> Dear Mr. Bullock:
>
> While you, Scott Vachris and I were reviewing the evidence in this case with Detective Coerse last week, we had a conversation about possible plea negotiations. At that time, I hypothetically posed a plea to involuntary manslaughter and unlawful wounding. Pleas

> to those charges of necessity would result in a nolle pross[e] of the existing use of a firearm charges, and thus the mandatory time associated with those charges should there be convictions.
>
> Today, Scott Vachris advised that he had spoken to you yesterday and you conveyed that Mr. Belmar was rejecting the plea offer and wanted to have a jury trial. The purpose of this letter is to formally place that offer before you and Mr. Belmar in order to avoid any potential post-conviction issues regarding plea offers.

(ECF No. 1-3, at 2.) As explained below, the record establishes that Bullock did not convey the plea offer to Belmar; that Belmar never learned of this plea offer until after he was convicted and sentenced in the Circuit Court; and that Belmar would have accepted the offer if he had been given the opportunity.

**B.  The Deficient Performance Issue**

    **1.  The Making Of The Plea Offer And Belmar's Discovery That An Offer Had Been Made**

Belmar contends that he did not know of the plea offer until he was told about it by Robert Morecock, who represented Belmar at sentencing. The testimony on that point comes from Bryant, Belmar, Morecock and Bullock. The record establishes the validity of Belmar's contention.

Belmar initially retained Michael Morchower to represent him. Belmar requested that Morchower approach the Commonwealth's attorney and seek to have the charges reduced to

manslaughter. Belmar discharged Morchower shortly after the date set for Belmar's preliminary hearing because Morchower waived the preliminary hearing in exchange for Bryant's agreement to provide information that he was obligated to provide in any event (a matter as to which Belmar was advised shortly after Morchower made the agreement) and because Morchower acted strangely.[3] However, the undisputed record shows that Morchower did not communicate any information about a plea offer to Belmar.

Belmar then retained Bullock in April 2012. The record also shows, again without dispute, that in April or May of 2012, Belmar surrendered the license to operate his security business. In June of 2012, Belmar's wife, who was in the Navy, was transferred to the state of Washington. On or about June 12, 2012, Belmar and his family drove from Virginia to Louisville, Kentucky for his great-grandmother's funeral. Thereafter, the family drove from Louisville to Alabama for the burial, and then back to Louisville. The family then flew from Louisville to the state of Washington around June 23, or June 24, 2012. Those facts are not in dispute either.

In late July or early August, while Belmar was in Oak Park, Washington, he received a package of discovery from Bullock.

---

[3] Bullock testified that, at the time, Morchower was not mentally competent, although apparently that diagnosis was not made until after Morchower was discharged.

However, that communication did not contain the plea offer that the Commonwealth had confirmed by Bryant's letter dated June 1, 2012. There is no record evidence suggesting otherwise and so the Court finds, as a fact, that the "discovery" package did not contain the plea offer or any mention of it.

Belmar's criminal trial occurred on October 2 and October 4, 2012. After the conviction, Belmar discharged Bullock as his attorney. On October 22, 2012, Belmar went to Bullock's office and picked up what he was told was his case file. Belmar immediately turned the case file over to his new counsel, Robert Morecock.

Both Morecock and Belmar testified that the file did not contain any information about a plea offer. Indeed, Morecock testified that the file contained only the standard materials that the Commonwealth would provide to defense counsel, such as the autopsy report, witness statements, and photographs of the crime scene. Morecock also testified that the file did not contain copies of any letters from Bullock to Belmar, such as cover letters that accompanied the discovery and the plea offer that Bullock says he sent to Belmar. And, according to Bullock, such correspondence should have been in the file that was delivered to Belmar and thence to Morecock.

Nor did the file that was delivered to Belmar and thence to Morecock contain any of the documents that would typically be

generated in the course of investigating a case of this sort and preparing it for trial. For example, the file contained no notes of Bullock's interviews with the many witnesses that, according to his testimony, he interviewed. Nor did the file contain notes of the discussion that Bullock says he had with the medical examiner. Nor were there copies of letters to or from counsel and Belmar or letters to opposing counsel. Nor did the file delivered to Morecock contain any notes of Bullock's factual interviews with Belmar. During these federal habeas proceedings, Bullock did produce what purported to be a note of one conversation with Belmar on June 13, 2012, the particulars of which are considered in Section III.B.2 below.

A day or so after Belmar's sentencing, the prosecutor and Morecock were talking and the prosecutor asked why Belmar had not accepted the plea offer. That was the first time Morecock had ever heard about a plea offer, and Morecock was "dumbfounded" to learn that there had been a plea offer. Morecock then asked Belmar why he had never mentioned this generous plea offer. Belmar responded that he did not know what Morecock was talking about. When Morecock explained the offer that had been extended by the Commonwealth, Belmar was, according to both Belmar and Morecock, shocked and angry because he would have accepted the offer. Belmar's testimony is consistent with that given by Morecock and, Morecock's testimony

supports Belmar's version of when, and how, Belmar first learned of the plea offer, as well as Belmar's spontaneous utterance when he learned of the offer. The Court finds the testimony of both Belmar and Morecock on this point to be fully credible.

Morecock then asked Bullock to provide anything in his Belmar file pertaining to a plea offer. In response, Bullock obtained a copy of the plea offer from the Commonwealth's Attorney and then sent the same to Morecock. Bullock did not provide Morecock with the June 13, 2012 note reflecting that he had communicated the plea offer to Belmar which was offered in this proceeding as Exhibit B.

Thereafter, Morecock moved the Circuit Court to vacate Belmar's sentence based upon Bullock's failure to communicate the plea offer. Morecock was unsuccessful.

> ### 2. Bullock's Version Of Events With Respect To The Plea Offer Is Fraught With Untrue Statements And Is Not Credible

In response to Belmar's state habeas petition, the Respondent filed, inter alia, a sworn affidavit from Bullock (Evid. Hr'g Ex. J). The record reflects that Bullock's declaration is untrue and inaccurate in a number of critical aspects.[4] Bullock swore:

---

[4] The Court has underlined those aspects of Bullock's affidavit that have been proven to be untrue. The Circuit Court relied heavily upon Bullock's sworn statement in finding that Bullock conveyed the plea offer and that Belmar rejected the

> First of all, Mr. Belmar was fully aware of the plea offer referenced in the petition when he retained me after he was no longer represented by Mr. Morchower. He told me Mr. Morchower had shared the same plea offer with him and he had rejected it. His primary reasons for rejecting the plea offer were because a felony conviction would prohibit him from operating his security business and prohibit him from owning or possessing any firearms for the rest of his life.
>
> Additionally, he believed he had done nothing wrong and he justifiably acted in defense of his security personnel who he believed were in imminent danger.
>
> I gave Mr. Belmar a copy of the plea offer along with the discovery. I discussed the plea with Mr. Belmar several times over the course of my representation and he repeatedly rejected it for the previously mentioned reasons. I had him to write his rejection on the written offer for my records.
>
> However, after the trial was completed, the court allowed Mr. Belmar to remain on bond pending sentencing. Mr. Belmar requested his file and I authorized my secretary to give him his entire file. He picked his file up from my office at a time I was not present and inadvertently, my copy of the plea offer he had signed and rejected, was given to him in the file he obtained.

Motion to Dismiss Ex. 2, at 1, <u>Belmar v. Pearson</u>, No. CL14-4270 (Va. Cir. Ct. Dec. 11, 2014) (emphasis added). Each aspect of Bullock's affidavit will be considered in turn.

---

offer. As discussed herein, Belmar has satisfied his burden to produce clear and convincing evidence rebutting these findings of fact by the Circuit Court. <u>See</u> 28 U.S.C. § 2254(e)(1).

To begin, during the state habeas proceeding and in the federal evidentiary hearing, Bullock swore that Belmar was aware of the plea offer because a similar plea offer had been made to Morchower, Belmar's first lawyer, and that Belmar had rejected the plea offer. That simply is not true. Bryant, the Commonwealth's Attorney, testified unequivocally that no plea offer had been made to Morchower. The Court credits Bryant's testimony on that point and rejects Bullock's as incredible. The record confirms Belmar's testimony that Morchower never presented a plea offer to Belmar and per force that he had not rejected one.

Second, Bullock swore that Belmar's primary reason for rejecting the offer was that it would preclude Belmar from operating his security business. However, both the trial record and the record from the evidentiary hearing establish, without dispute, that Belmar had shut down his security business by the time the prosecution made the offer. That, of course, substantially undercuts the credibility of Bullock on that point, and generally.

Third, Bullock swore in the state proceedings that he "gave Mr. Belmar a copy of the plea offer along with the discovery." Motion to Dismiss Ex. 2, at 1, Belmar v. Pearson, No. CL14-4270 (Va. Cir. Ct. Dec. 11, 2014) (emphasis added). During the course of the federal evidentiary hearing, Bullock acknowledged

that statement to be untrue and he said, instead, that he had mailed the discovery and the plea offer to Belmar in entirely separate packages. Bullock, however, could not produce a cover letter for the plea offer that he purportedly sent to Belmar. The absence of such a letter or other documentation evincing the sending of a plea agreement casts doubt on Bullock's testimony on that point, and generally.

Fourth, Bullock produced in these proceedings (for the first time ever) a note that he says was made on June 13, 2012 wherein he wrote that he had discussed the plea offer he had sent to Belmar by mail and that Belmar was rejecting the offer. Bullock could not explain why he did not turn that document over to Morecock when Morecock requested everything in Bullock's files pertaining to the plea offer for use in the state proceedings. The belated production of the note and the failure to explain why it was not given to Morecock calls its reliability into serious question.

Fifth, and relatedly, Bullock did not follow standard practice when turning over his file to Belmar. Specifically, the record shows that it is the usual practice of lawyers in the area to make, and retain, a copy of all documents turned over to a client when representation is terminated. Indeed, Bullock confirms that was his practice at the time as well. For reasons

neither explained nor readily apparent, Bullock did not follow that practice in this case.

However, Bullock did retain a boxful of documents in his own Belmar file. And, he brought the box to the evidentiary hearing. Upon examination, the box contained no copy of the plea offer letter, no copy of a letter forwarding it to Belmar, and not one document mentioning the plea offer.

Under the circumstances, it is not possible to place credence in the solitary note (June 13, 2012) purporting to reflect a summary of Bullock's telephone discussions with Belmar about a plea offer.

Sixth, there is yet another reason to doubt the reliability of that note, and Bullock's credibility. The premise of the note is that Belmar knew about the plea offer because Bullock had "sent [it] to him [Belmar] by mail." (Evid. Hr'g Ex. B.) And, according to Bullock that mailing occurred between June 1 (the date of Bryant's letter extending the offer) and June 13 (the date of the note).

Bullock testified in the federal evidentiary hearing that he mailed the plea offer to an address in Portsmouth where Belmar no longer resided. The record is clear that Belmar's wife had been transferred to Oak Harbor, Washington and that, by mid-June, the Navy had packed the family's household goods and shipped them. The record is also clear that, in mid-June, the

family had traveled to Louisville, Kentucky for a funeral and then to Alabama for the burial, and then had returned to Louisville. They then traveled by air from Louisville to the state of Washington, arriving in Washington in the next to last week of June 2012. Under these circumstances, it strains credibility to accept that a letter mailed to a Portsmouth, Virginia address in early June 2012 would be in Belmar's hands at some location in either Kentucky or Alabama on June 13, 2012, the date of Bullock's note.

Even if one assumes that the June 1 plea offer letter somehow reached Belmar by June 13, the contents of the note simply cannot be true. That is because the June 1 plea offer letter recites that: (1) the plea offer had been verbally offered by Bryant the week before the June 1 letter (the last week of May 2012); and (2) even before the June 1 letter was sent Bullock had discussed the offer with Belmar who had, by June 1, rejected it. That, of course, is flatly at odds with Bullock's testimony that the rejection was made two weeks later. And, considering the significance of the topic, it is significant that Bullock has no record of discussing the offer, or receiving Belmar's rejection, sometime in the last week of May 2012 or on June 1, 2012. The absence of such a record casts further doubt on the reliability of both the June 13 note and Bullock's testimony about it.

Finally, there is another quite troubling matter affecting Bullock's credibility respecting whether the plea offer was communicated to Belmar. Specifically, Bullock swore in the state proceedings to a key point as to which he was unsure. Thus, in the affidavit that Bullock filed in the state habeas proceedings, Bullock swore that: "I had him [Belmar] to write his rejection on the written offer for my records."

At the evidentiary hearing, Bullock testified as follows:

> Q.   To your knowledge, did he sign and reject it [the plea offer]?
>
> A.   I'm not really sure to be honest with you. I'm not sure.
>
> Q.   You really don't recall that?
>
> A.   I'm not sure.

Bullock could not produce a copy of that document. Nor was one in the file that Bullock turned over to Morecock. Moreover, Bullock could not even describe the occasion on which Belmar is said to have written his rejection on the plea offer.

Bullock's contradictory testimony, and the absence of a copy of the plea agreement bearing Belmar's written rejection, further undercuts Bullock's credibility generally and the reliability of the note. Considering Bullock's demeanor during that exchange with counsel for the state at the federal evidentiary hearing, as well as the record as a whole, the Court finds to be untrue the statement in Bullock's affidavit that:

"I had him [Belmar] to write his rejection on the written offer for my records."

Belmar, on the other hand, was a very credible witness. He was specific and definite in the statements that he made. He did not try to varnish the truth or give equivocal answers. His demeanor was that of a man telling the truth. His testimony makes sense in perspective of the record as a whole. The key aspects of his testimony are confirmed by the testimony of Bryant and Morecock. And, where Belmar's testimony is in conflict with Bullock's, the Court accepts Belmar's testimony as credible and rejects Bullock's version as incredible.

Therefore, the Court, finds that Bullock never communicated the plea offer to Belmar. Contrary to Bullock's assertion, Belmar was indeed interested in securing a reduced charge from the outset. In fact, he expressed that intent to Morchower early on in the case. And, according to Bryant, Morchower told him that "there's not going to be a trial in this case." That set of facts alone establishes that Belmar was interested in a plea arrangement and that he was not measuring that question by the effect it might have on his security business.

Belmar was aware that whatever the reduced charge may be, he would have a felony conviction and would serve time in prison. He, therefore, knew that he could no longer operate a security business. And, well before the plea offer was

extended, he had surrendered his license and shut down the security business. His testimony on those points stands unrebutted. And, on the whole, the evidence from Belmar and Bryant convincingly rebuts Bullock's contrary assertions that Belmar turned down the plea offer because it would result in a felony conviction, prison time, and the shutting down of the security business.

To be precise, Bullock's testimony on that point is rejected as not credible. And, because those points were also central to Bullock's assertion that he conveyed the plea offer to Belmar, that lack of credibility about the alleged reason for rejection is another reason that Bullock's testimony about conveying the offer to Belmar is itself not credible.

### 3. Belmar Has Proved That Bullock Performed Deficiently

Considering the record as a whole, the Court finds that Belmar has proved convincingly that Bullock performed deficiently by completely failing to inform Belmar of the prosecution's plea offer. _Brannon_, 48 F. App'x at 53 (citing _Blaylock_, 20 F.3d at 1465-66).

### C. Prejudice

In the context of this case, "the prejudice inquiry focuses on 'whether counsel's constitutionally ineffective performance affected the outcome of the plea process.'" _United States v._

*Merritt*, 102 F. App'x 303, 307 (4th Cir. 2004) (quoting *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)). To prevail on the prejudice issue, Belmar must demonstrate "a reasonable probability" that he would have accepted the plea offer if he "had . . . been afforded effective assistance of counsel." *Missouri v. Frye*, 566 U.S. 134, 147 (2012); *see* *Merritt*, 102 F. App'x at 307.

Although the record reflects that Belmar did not believe that he was guilty of the charges of second-degree murder, malicious wounding or unlawful discharge of firearms and that he entertained the notion of contesting those charges, the record also establishes that, from the outset, he was interested in some plea arrangement. To that end, Belmar asked Morchower if the prosecution would consider reducing the second-degree murder charge to manslaughter. That evidence demonstrates that Belmar viewed the situation realistically and was amenable to accepting a plea arrangement. Further confirmation of Belmar's willingness to accept a favorable plea is found in the undisputed evidence that Belmar asked Morchower to secure a deal for a plea to lesser charges (manslaughter) and Morchower's statement to Bryant that the case would not be going to trial.

Here, the plea offer was extremely favorable to Belmar and reflected the prosecution's concern about whether Belmar would be convicted of the serious charges that he was facing. Under the plea offer, the murder charge would be dropped and replaced

by what Belmar previously had expressed to be a charge—
involuntary manslaughter—that he could accept. Additionally,
the plea offer reduced Belmar's maximum sentencing exposure from
sixty-eight years to fifteen years. And, Virginia's sentencing
guidelines suggested that Belmar could serve as little as one
year and eleven months in prison if he accepted the plea offer.
(ECF No. 11, at 10.) The realistic attitude displayed by Belmar
at the outset teaches that he would have regarded the offer made
by Bryant as a favorable one (as indeed it was) and that he
would have accepted it.

In assessing whether Belmar would have accepted the plea
offer, the Court also must consider what impact the advice of
competent counsel would have had on that decision. In this
regard, counsel "should usually inform the defendant of the
strengths and weaknesses of the case against him, as well as the
alternative sentences to which he will most likely be exposed."
Purdy v. United States, 208 F.3d 41, 45 (2d Cir. 2000) (citing
United States v. Gordon, 156 F.3d 376, 380 (2d Cir. 1998); Jones
v. Murray, 947 F.2d 1106, 1110-11 (4th Cir. 1991)). In this
instance, such advice would have informed Belmar that, while the
prosecution's evidence was far from overwhelming, Belmar stood a
significant chance of getting convicted of all the charges and
spending decades in prison. Belmar was never given the advice
to which he was entitled, because Bullock never made the plea

offer known to Belmar. The Court, therefore, rejects, as incredible, Bullock's testimony that he advised Belmar of the pros and cons of the plea offer.

At the evidentiary hearing, Belmar credibly testified that he would have pled guilty to involuntary manslaughter and unlawful wounding as required by the plea offer in order to avoid the risk of spending decades away from his wife and four children. Here too, the Court fully credits Belmar's testimony, not only because he is a credible witness, but also because his testimony is in full alignment with common sense.

For the foregoing reasons, Belmar has demonstrated that, but for the deficiency of counsel, he would have accepted the plea offer.[5]

## IV. The Remedy

The pertinent statute provides that a Court shall dispose of a petition for a writ of habeas relief "as law and justice require." 28 U.S.C. § 2243. "The typical relief granted in federal habeas corpus is a conditional order of release unless the State elects to retry the successful habeas petitioner . . . ." Herrera v. Collins 506 U.S. 390, 403

---

[5] The record does not indicate that the Circuit Court would have prevented the plea offer from being accepted or implemented. See Frye, 566 U.S. at 148.

(1993). "District courts rightly favor conditional grants, which provide states with an opportunity to cure their constitutional errors, out of a proper concern for comity among the co-equal sovereigns." Gentry v. Deuth, 456 F.3d 687, 692 (6th Cir. 2006).

The remedy proposed by Respondent is fully consistent with these fundamental precepts. (ECF No. 31.) Accordingly, the Court will grant the writ unless the Commonwealth of Virginia promptly reoffers the plea offer to Belmar and provides Belmar an opportunity to accept it. Specifically, the Court will require that:

(1) Within twenty (20) days of the date of the entry hereof, the convictions and sentences for second-degree murder, malicious wounding, and two firearm charges shall be vacated conditionally (conditioned upon completion of the requirements of paragraph (5)) to put the matter in the posture it was in before Belmar's constitutional rights were infringed; and

(2) Within thirty (30) days of the date of entry hereof, the Commonwealth shall prepare and provide Belmar with a written plea agreement allowing him to plead guilty to the charges of involuntary manslaughter and unlawful wounding in lieu of all the other charges; and

(3) If the petitioner accepts that offer, he and counsel shall sign the agreement as required by Va. Sup. Ct. Rule 3A:8; and

(4) The trial court then shall forthwith amend the existing indictments as follows - murder to involuntary manslaughter and malicious wounding to unlawful wounding and then *nolle prosequi*/dismiss the two firearms charges; and

(5) Petitioner shall, if he so desires, enter guilty pleas to the two amended charges after:

   (a) truthfully and completely filling out any guilty plea questionnaires or guilty plea forms used in the trial court;

   (b) truthfully and completely answering all questions during the guilty plea colloquy with the trial court; and

(6) Within sixty (60) days of the date of entry hereof, after the guilty pleas to the amended charges are freely and voluntarily entered by Petitioner and accepted by the trial court, the trial court shall sentence Petitioner in accordance with Virginia law.

If the Commonwealth fails to comply with the directions set forth above, the writ of habeas corpus shall issue and Petitioner shall be immediately released from custody.

The Clerk is directed to send a copy of this Memorandum Opinion to counsel of record.

It is so ORDERED.

_____ /s/    REP
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: March 30, 2018